Green, J.
delivered the opinion of the court.
The plaintiff in error was indicted in the Circuit Court oí Henry county, for the murder of Armstead Forrest, his . master, and was found guilty by the jury and sentenced to suffer death. From this judgment he has appealed to this court.
The counsel for the prisoner insist that he ought to have a new trial on two grounds, viz:
1, .Because the evidence did not warrant the verdict &c.
2. Because the affidavits shows that the prisoner was surprised on the trial.
The case ha3 been ably argued by the prisoner’s counsel and the magnitude of the interest involved, have induced on our part the most mature deliberation.
The principal witness for the prosecution, (Jackson, a black boy, about 17 years old,) it is insisted, ought not to be believed and upon the question of his credibility, the stress of the argument rests.
*525 Jackson says, that himself and the prisoner, were sent to a tobacco barn to strip tobacco, (the prisoner taking with him a large hickory stick with he had cut the day before,) that after they had been at the barn a short time their master came, and that soon after while he was sitting down stripping tobacco, Gilbert, the prisoner standing near, and having his hickory stick, struck the deceased on the head, holding the stick in both hands; that the deceased fell and did not speak. The prisoner then sent the witness for fire, which he brought, and then ran up in the field; that he soon afterwards saw the barn was on fire, and the prisoner came to the field where the witness was and told him they must say the barn caught on fire, and they fought the fire with brush, and their master got burned up; that the witness and prisoner then went to the house and told the family that the barn had caught on fire, and that they and their master had fought the fire with brushes and boards, and that they could not get their master out, and that he was burned up. The deceased was an old and very nearly blind man.
On cross examination, the witness said there was some trash fodder and tobacco in the barn which was very dry, and that it was a windy day. The witness stated, that in the evening of the day his master was killed, a great many persons were collected at a place where the barn was burned; that he told them that the bam had caught on fire and that he and the prisoner and his master fought it as long as they could, that his master’s clothes caught on fire, and that he and the prisoner got out themselves, but could not get their master out, that J. C. Porter and others caught witness, and tied him and took him to a log and told him, they intended to make him lay there until they whipped him to death, if he did not tell who killed his master, that he thought they would whip him to death, and he then told them the prisoner killed him, the witness stated he was scared nearly to death, and would have told Porter and others, any tale in the world, true or false, to have gotten them not to whip him, and to get clear himself, and that he would be afraid to tell any other tale than the one he told the men if it was a lie; he was not afraid to tell the same tale he told them, because it was the truth.
*526 The'witness said the prisoner had whipped him frequently severely, and he sometimes would have been willing to see him hung, but they wei’e friendly the day of the murder. The deceased was a kind master. The witness stated that he did not tell on the prisoner at first, because they were friendly that morning, and being interrogated he then said he was afraid of Gilbert. The witness and prisoner are half brothers.
It is insisted that the testimony of this witness is incredible. 1st, because hejwas particeps criminis in this transaction. 2nd, because he is inimical to the prisoner, and thirdly, because the tale he tells was extorted by extreme fear and he is now afraid to tell any other.
The two first grounds of discrediting the witness have but little weight. It was hardly to be expected that circumstanced as the witness was, that he would disclose the crime voluntarily on the prisoner. They belong to the same class, and from the very nature of things he was in the habit of keeping secret the faults and misconduct of his class from his master or other white persons. And as respects his alledged enmity, we think, from his statement there is no evidence of its existence.
True, Gilbert sometimes w’hipped him, and when thus excited to anger, he says he would have been willing to have seen Gilbert hung. But in a boy like this witness, and standing in the relation he did, these would most probably be his momentary feelings and would create no abiding enmity, and the witness states that he and the prisoner were friendly on the morning of the murder.
The feeling of fear that dictated the disclosure;, and that would induce the witness to adhere to the statement, even if it were false, it must be admitted would greatly weaken the force of his testimony unsupported by other facts and circumstances inthe case. Bulinour opinion, after the most deliberate examination and mature reflection, the testimony of Jackson is fully sustained by other proofs and by the facts of the case.
In the first place, the tale about the barn having caught on fire, and the impossibility of getting the deceased out, is unreasonable in itself. The barn had been a dwelling house and had a fire-place and a chimney. It is not probable that the presence *527 of fire on the hearth would have communicated the flame to the building. There were'onlyafewleaveshanging, andsome trash tobacco and trash fodder on the floor. If by any accident this trash had taken fire, it could have been easily extinguished as they were all present and wrnuld most probably perceive it before much progress could have been made by the flame. And finally it is not to be believed that if the flame had got to the house and had risen beyond the control of the parties, two young athletic men could not have rescued the old man from the burning house.
These considerations lead our minds to reject the hypothesis, that the first account of the transaction can be true. But in addition to this, the account Jackson gives of the circumstances of the murder, his own ageney in the transaction,and the artifice of the prisoner to avoid detection, are all natural and are detailed in a manner calculated to impress us with a conviction of his sincerity and of the truth of his statements. He frankly admits the resentful feelings he had towards the prisoner, when whipped by him, and that on those occasions he would willingly have seen him hung: He does not hesitate to state that the true account of the transaction was extorted by fear, and that but for apprehension that he would have been whipped to death, he would not have told on the prisoner. His account of his obedience to Gilbert, when directed to bring fire, and that he ran off to the field so soon as he delivered the fire, is in accordance with the conduct, we would naturally expect from such a person under such circumstances.
The prisoner having perpetrated the act in his presence in requiring him to bring the fire, he had no choice but to obey or to disclose the transaction, but after he had brought the fire, he was naturally seized with a feeling of alarm at what had taken place, and he disappeared from the scene of the crime as soon as he could do so.
The account Jackson gives of the prisoner’s conduct, after the fatal blow was struck, commends itself to our belief, because it shows that the prisoner resorted to an artifice probably under the circumstances, the most likely to avoid detection of any that could have been devised.
*528 By burning the bam the body of the deceased was burned, and if Jackson had kept the secret as the prisoner had a right to think he would do, implicated as he was in the crime, it would have been difficult to have done more than suspect the guilt of these persons without being able to prove anything that would have led to a satisfactory conclusion. And, we do not think, that the witness,agitated by extreme alarm as he was, could have fabricated a tale so consistent and probable as the one he has told when about to be whipped; and willing to say any thing that would save him, if his first account of the matter had been true, we should most probably have found in his fabricated statement many incongruities and discrepancies, the inventions of a a mind under extreme agitation from fear. But instead of incongruities and contradictions in his statement, we have seen that the conduct his evidence attributes to himself and to the prisoner, is most natural and consistent with that which we would expect to take place under the circumstances.
These considerations lead us to the conclusion that Jackson is to be believed, in view of his own statement alone, but when we add to these the facts detailed by Coleman, another negro boy, we think there can be no doubt of the truth of Jackson’s testimony.
Coleman says, that the prisoner had a wife at his master’s house, and that he wished to leave her and get a girl of Dunlap’s fora wife, but that his master refused to permit him to do so. Coleman heard the prisoner threaten his master’s life several times, and had seen him with the hickory, which he called the peace-maker. The statements of Coleman strongly corroborate Jackson arid induce the most unqualified belief of Jackson’s testimony. In addition to the facts proved by these witnesses, the facts which were proved in relation to the pocketbook and purse of the deceased, are pregnant evidence of the guilt of the prisoner.
He was told that if hehad money he could get lawyers to clear him, and he then told the sheriff of a certain pocket-book and purse, describing them and the places where he hid them, and the men took the defendant and went to the places described, and the defendant showed the pocket-book and purse so de *529 scribed in the places described, the former containing a note and the latter some money. The purse was shown about eighty yards from the barn covered over with a piece of bark, and the pocket-book about three quarters of a mile in another direction. Another witness proved that the prisoner said that he got the money in the purse from travellers by stealing, and some of it by sellingchickens in town, and the pocket-book he took from the table several days before the fire; where his master left it on being called out to the fence by some person who was passing by. These facts about the pocket-book and purse, connect themselves irresistibly with the death of the owner of the articles. If the money and pocket-book had been obtained as the prisoner stated they were, they would not have been hid out where they were found. The purse and pocket-book are proved to have belonged to the deceased, and the prisoner does not attempt to account for the purse from them. Coleman had seen it in his master’s possession a day or two before his death, and now we find it hid out by the prisoner eighty yards from the barn, and he does not attempt to account for the manner in which he got it; the only inference is that he took it from his master’s person after he was slain, and while Jackson went for fire. It is possible that he obtained the pocket-book at the time and in the manner stated by him, and it was hid at a different place from that at which the purse was found, but no attempt is made to explain his possession of the purse. These facts corroborate strongly the accusation against him and together with the testimony of Jackson and Coleman, leave no room to doubt his guilt.
It is insisted that the prisoner had no motive to kill his master, that he was kind and indulgent to him, and that he could not hope to fall into better hands.
We think the motive disclosed in the testimony, to a mind depraved, regardless of social duty and bent on mischief, is entirely sufficient to account for the act. The records of crime present many cases of murder of husbands and wives, that the licentious passions might be gratified without restraint in the formation of other connections. In this case the will of the *530 master was the obstacle in the way of the prisoner’s desires and that obstacle he resolved to remove.
But it is said a new trial ought to have been granted upon the affidavits. On the trial J. C. Porter proved that he saw blood on the prisoner’s pantaloons, after he apprehended him on the day of the murder. After the trial the prisoner filed his affidavit, stating that he was surprised by this testimony, that he did not know it would be produced against him, nor did he know he could explain it until after the trial. He states that on the morning the barn was burned, he went hunting, and his dogs treed an opossum which he shook down, and that they bit it very much when they caught it so that it bled freely, that he took it up and carried it in his hand swinging down by his leg, and thus got the blood on his pantaloons, and that he left the opossum at J. H. Dunlap’s plantation wnth his negroes. He can prove the facts by John Mai’r, whose affidavit he presents; John Marr made affidavit that the morning the tobacco barn was burned up, he saw the prisoner passing by the farm of J. H. Dunlap, having with him dogs and an opossum, the opossum appeared to have been recently caught and was very much torn, and was very bloody, that the prisoner was carrying it swinging in his hand by his side, and left it with one of the negroes on the farm, and that affiant did not tell the prisoner that he knew these facts until after the proof was closed and several of the attorneys had spoken.
These facts are insufficient to authorise a new trial; the affidavits make out no case of surprise but one of mere negligence. The prisoner’s affidavit states that the pantaloons were made bloody by the opossum. He knew then that they were bloody, and after he was accused of the murder, it must have occured to him that this blood would be noticed and ought to be explained. He knew that he could prove the facts about the opossum, by Dunlap’s negroes and overseer. He had seen them, left the opossum at Dunlap’s, and knew that they had seen him with it. He was not surprised, therefore, as to the existence of the fact of the blood, nor was he ignorant that he could make the explanation now offered. But Marr’s affidavit does not state that the pantaloons were made bloody by the opossum, *531 he only states facts from which it may be inferred that such might have been the case. The application is much less imposing than it would have been, had Marr seen blood on the pantaloons in the morning. But even in that case it would only have been a circumstance to weigh in determining the question of a new trial. Of itself it constitutes no ground for setting aside the verdict, because it presents no cause of surprise. If upon the other proof any doubt could exist of the prisoner’s guilt, these affidavits would determine the mind in favor of a new trial. But no such doubt exists, and as they do not fall within the rule of law in relation to surprise, we do not think them entitled to any weight.
There is no error in the records, the judgment must be affirmed.
SENTENCE-OF THE COURT.
GxlbeRt: — You are charged with having murdered Arm-stead W. Forest, your master. You have been tried by a jury, who heard all the proof in the case, and they have pronounced you guilty. You have appealed to this court. We have heard your case, and have deliberately weighed all the facts and arguments in your favor, and, we do not doubt, that you did the murder with which you are charged. It was a cruel murder, inflicted on a feeble old man, who had always been kind to you; and for no other reason than that he would not consent that you should gratify the unlawful desire, to abandon your wife and take another. You have shed the blood of your fellow man by violence. You have suddenly, cut short his existence without warning, and perhaps without preparation. By the laws of the country, your life is the forfeit for this crime. And unless you repent, you will be doomed to eternal woe. Do not indulge a hope that you can be pardoned by man; but employ the few remaining days of your life in seeking, by humble penitence and prayer, the pardon of all your sins from your maker.
And now, it remains only to pronounce the sentence of the law, which is, that you be taken to prison from whence you came, there to remain until Friday the 21st day of May next, when you will be taken to some place within a mile of the town *532 of Paris, and there, between the hours of 10 A. M. and 5 P. M., you will be hung by the neck, until you are dead; and may God have mercy on your soul.